******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# RALPH BIRCH *v.* COMMISSIONER OF CORRECTION
## (SC 20136)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

The petitioner, who had been convicted of felony murder in connection with the stabbing death of the victim inside the victim's home during what appeared to be a botched burglary, sought a writ of habeas corpus, claiming, inter alia, that the state deprived him of his due process right to a fair trial insofar as it failed to correct the trial testimony of L, a former director of the state police forensic laboratory, that a red substance on a towel found in the victim's home after the murder tested positive for blood when no such test had been conducted and when subsequent testing conducted in connection with the present habeas action revealed that the red substance was not in fact blood. The habeas court rendered judgment denying the habeas petition. With respect to the petitioner's due process claim, the court concluded that, because L mistakenly but honestly believed that the towel tested positive for blood and, thus, did not give perjured testimony, the burden was on the petitioner to demonstrate that there was a reasonable probability of a different verdict if the correct evidence had been disclosed. Applying this standard, the habeas court determined that L's testimony was immaterial because, among other things, the state's criminal case against the petitioner did not rely on forensic evidence but, rather, on the testimony of numerous lay witnesses. On the granting of certification, the petitioner appealed, claiming that the habeas court applied the incorrect standard for determining whether the petitioner was entitled to a new trial and that, upon application of the correct standard, which required the respondent, the Commissioner of Correction, to establish beyond a reasonable doubt that L's incorrect testimony was immaterial, he was entitled to a new trial. *Held* that, on the basis of this court's analysis in the companion case of *State* v. *Henning* (334 Conn. 1), this court concluded that the state's failure to correct L's incorrect testimony that there was blood on the bathroom towel deprived the petitioner of a fair trial, and the habeas court's judgment was reversed, as it was predicated on a determination that the petitioner was not entitled to a new trial because L's incorrect testimony was immaterial: the habeas court incorrectly concluded that the respondent was not required to establish beyond a reasonable doubt that the state's failure to correct L's incorrect testimony was immaterial, as controlling case law made it clear that such a standard applies whenever the state fails to correct testimony that it knew or, as in the present case, should have known to be false; moreover, L, as the representative of the state police forensic laboratory, should have known that the towel had not been tested for blood, as he had an affirmative obligation to review any relevant test reports before testifying so as to reasonably ensure that his testimony would accurately reflect the findings of those tests, and L's incorrect testimony must be imputed to the prosecutor who, irrespective of whether he elicited that testimony in good faith, is deemed to be aware of any and all material evidence in the possession of any investigating agency, including the state police forensic laboratory; furthermore, the respondent did not meet his burden of establishing beyond a reasonable doubt that L's incorrect testimony was immaterial, as the state apparently offered L's testimony concerning the towel to demonstrate the petitioner's efforts to conceal evidence of the murder before he left the victim's home, the jury reasonably could have relied on the state's theory regarding the petitioner's use of the towel to conceal evidence, the state's case against the petitioner was not so strong as to take it out of the purview of cases in which, as a result of the state's use of testimony that it knew or should have known was false, reversal is virtually automatic, and the state's failure to correct L's testimony was material because it deprived the petitioner of the opportunity to impeach certain other testimony by L regarding how it was possible that the petitioner and his alleged accomplice, H, stabbed

the victim twenty-seven times in a narrow space and tracked blood all over the victim's home but somehow managed not to leave any trace of blood in their getaway vehicle, which showed no signs of having been cleaned when the police recovered it a few days after the murder.

Argued October 11, 2018—officially released June 14, 2019*

*Procedural History*

Petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Sferrazza, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed. *Reversed*; *judgment directed.*

*Andrew P. O'Shea*, for the appellant (petitioner).

*Michael J. Proto*, assistant state's attorney, with whom were *Jo Ann Sulik*, supervisory assistant state's attorney, and, on the brief, *David S. Shepack*, state's attorney, for the appellee (respondent).

*Opinion*

PALMER, J. In the early morning hours of December 2, 1985, sixty-five year old Everett Carr was brutally murdered in his New Milford residence. Subsequently, the petitioner, Ralph Birch, and a second man, Shawn Henning, were arrested and charged with Carr's murder, which the police theorized was committed during the course of a burglary of Carr's home by the two men. After a jury trial, the petitioner was convicted of felony murder, and, following his appeal, this court upheld the petitioner's conviction.[1] See *State* v. *Birch*, 219 Conn. 743, 751, 594 A.2d 972 (1991). Thereafter, the petitioner filed two habeas petitions, the first of which was denied by the habeas court, *Zarella, J. Birch* v. *Warden*, Docket No. TSR-CV-92-1567-S, 1998 WL 376345, *11 (Conn. Super. June 25, 1998). The second petition, which is the subject of this appeal, alleged, among other things, that the state deprived the petitioner of a fair trial in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and its progeny, which require the state to correct any testimony that it knows or should know is materially false or misleading. More specifically, the petitioner claims that his right to due process was violated because the assistant state's attorney (prosecutor) failed to correct certain testimony of the then director of the state police forensic laboratory, Henry C. Lee, concerning a red substance on a towel found in the victim's home that, according to Lee, had tested positive for blood. In fact, no such test had been conducted, and, moreover, a test of the substance that was performed for purposes of the present case proved negative for blood. The habeas court, *Sferrazza, J.*,[2] rejected all of the petitioner's claims, including his claim with respect to Lee's testimony about the towel, and this appeal followed.[3] Because we agree with the petitioner that, contrary to the conclusion of the habeas court, he is entitled to a new trial due to the state's failure to alert the trial court and the petitioner that Lee's testimony was incorrect,[4] we reverse the judgment of the habeas court.[5]

The following facts and procedural history are set forth in the companion case of *Henning* v. *Commissioner of Correction*, 334 Conn. 1,    A.3d    (2019). "On November 29, 1985, the then [eighteen] year old petitioner, together with his [seventeen] year old friend, [Henning], and [Henning's] eighteen year old girlfriend, Tina Yablonski, stole a 1973 brown Buick Regal from an automobile repair shop in the town of Brookfield. Later that evening, the three teenagers drove the vehicle to New Hampshire to visit [the petitioner's] mother. While there, the vehicle's muffler was damaged and subsequently removed, causing the vehicle to make a loud noise when it was operated. When the trio returned to Connecticut on December 1, 1985, they went directly to the Danbury residence of Douglas Stanley, a local

drug dealer, where they freebased cocaine. In addition to selling the teenagers drugs, Stanley also acted as a 'fence'[6] for property they periodically stole from local businesses and homes. After leaving the Stanley residence, the petitioner and [Henning] dropped Yablonski off at her parents' home in the town of New Milford, arriving there at approximately 11:55 p.m.

"At that time, the victim was living at the home of his daughter, Diana Columbo, in New Milford, approximately two miles from the Yablonski residence. Sometime between 9 and 9:30 p.m. on December 1, 1985, Columbo left the house to visit a friend. When she returned home the next morning, reportedly between 4 and 4:30 a.m., she found the victim's lifeless body in a narrow hallway adjacent to the kitchen, which led to the victim's first floor bedroom. The victim, clad only in an undershirt and underwear, was lying in a pool of blood. Blood spatter and smears covered the walls around him, almost to the ceiling. An autopsy later revealed that the victim had sustained approximately twenty-seven stab wounds, a severed jugular vein, and blunt force trauma to the head. Investigators theorized that the victim had confronted his assailants in the hallway and fought for his life. The associate medical examiner could not determine the exact time of death, only that the victim died within twenty-four hours of his body being examined by the medical examiner and two and one-half to three hours of his last meal.

"The assailants left two distinct sets of bloody footprints near the victim's body and in other locations throughout the house. Beneath the victim's body, the police found what they believed to be a piece of the murder weapon—a small metal collar that separates a knife blade from the handle. The police also discovered blood on a dresser drawer in the victim's bedroom. Inside the drawer were a pair of bloody socks and a blood stained cigar box, indicating that the assailants had rummaged through the house after the murder. A videocassette recorder, jewelry, several rolls of quarters, and some clothing were reported missing." (Footnote in original.) Id., 5–6.

On the night of the murder, three of the victim's neighbors heard what they believed to be a vehicle with a defective muffler in the vicinity of the victim's residence. One of the neighbors, Gary Smith, heard it sometime between 10 p.m. and midnight, although he thought it was "[p]robably closer to midnight." Smith, who reported that the noise was unusual enough that he stopped what he was doing to look out the window, observed the vehicle just as it was passing his house and noticed that its taillights "were fairly wide set" and "round in appearance." Smith was shown a photograph of the stolen Buick at the petitioner's criminal trial and testified that he was positive that its taillights were not the taillights he observed on the night of the mur-

der. Smith further testified that he informed the police in the days following the murder that he had seen the taillights of the vehicle but that the officers never returned to show him a photograph of the stolen Buick's taillights for comparison. Upon cross-examination by the prosecutor, Smith acknowledged that the vehicle he saw was "not the noisiest" he had ever heard and that it was "probably fair to say it was not terribly noisy . . . ."

The evidence also established that, sometime between 12:10 and 12:30 a.m., two other neighbors, Alice Kennel and Brian Church, also heard a loud vehicle near the victim's residence. Kennel heard the vehicle, which she described as "very noisy," stop at the lot beside her house for approximately twenty minutes and then drive away. Church similarly reported hearing the vehicle stop for twenty to thirty minutes and then drive away. Neither Kennel nor Church actually observed the vehicle or heard its doors open or shut. Nor could either witness place the vehicle or its occupants at the victim's residence.

Because the police suspected that the victim had interrupted a burglary, they began their investigation by identifying known burglars in the area. One of the individuals they interviewed, Peter Barrett, gave them the names of the petitioner, Henning, Yablonski, and Stanley. On December 5, 1985, the petitioner went voluntarily to the police station to be interviewed about the murder. By then, the petitioner had heard about the murder from Stanley, among others, whom the police had already interviewed. According to Yablonski, who testified for the state at the petitioner's criminal trial, she, the petitioner, and Henning discussed the murder with several other people at Stanley's house on the afternoon of December 2, 1985. Yablonski further testified that, before speaking to the police, she, the petitioner, and Henning agreed to "get [their] stories straight" to prevent the police from learning about the stolen Buick and a number of recent burglaries that the teens had committed in the area. In furtherance of that plan, the three agreed to tell the police that they had hitchhiked to and from New Hampshire on the evening of November 29, 1985, and that they had hitchhiked home from the city of Danbury on the night of the murder, leaving there at approximately 2 a.m. and arriving in New Milford several hours later. In fact, however, they actually left Danbury at around 11:20 p.m.[7]

When the petitioner arrived at the police station on December 5, 1985, the officers did not question him about the victim's murder but, instead, asked him if he knew anything about a stolen Buick Regal. After initially denying that he did, the petitioner confessed to having stolen the Buick, explaining that he did so because he needed somewhere to live. That afternoon, he and Henning took the officers to a wooded area near

a reservoir in New Milford where the vehicle had been hidden. The petitioner and Henning also confessed to having used the vehicle in the commission of several burglaries, for which the two men were placed under arrest.

As we explained in *Henning* v. *Commissioner of Correction*, supra, 334 Conn. 1, "[w]hen the police recovered the Buick, it was evident that it had not been cleaned. According to several police reports and photographic exhibits, the vehicle was covered in dirt and filled with sand, sneakers, toiletries, food, blankets, pillows, various items of clothing, and what the police believed to be stolen electronics. Despite a thorough examination of the vehicle and the surrounding area, which involved draining two reservoirs and the use of specially trained dogs, the police found no evidence linking the petitioner or [Henning] to the murder. A search of the victim's neighborhood, including the surrounding roadways and fields adjacent to those roadways, also produced no incriminating evidence." Id., 9.

On December 9, 1985, Sergeant John Mucherino and Detective Scott O'Mara, both of the Connecticut state police, interviewed the petitioner at the Litchfield Correctional Center. During that interview, the petitioner again denied any involvement in the victim's murder. At the petitioner's criminal trial, Mucherino testified that, when he showed the petitioner a photograph of the victim's deceased body in a pool of blood, the petitioner's "whole body spasmed, and he literally almost fell out of [his] chair." Afterward, according to both Mucherino and O'Mara, the petitioner stared at the photograph for a short time and then, pointing to an area not shown in the photograph, but in the direction where the bathroom would have been, said either, "is that the bathroom there," or "[t]hat is the bathroom there,"[8] even though the location of the bathroom, though correctly identified by the petitioner, was not apparent from the photograph. According to Mucherino, when the officers attempted to question the petitioner regarding his apparent knowledge about the interior of the victim's home, the petitioner threatened to punch Mucherino, and the interview was terminated. Mucherino also testified that, at the time of the interview, he considered the petitioner's statement about the bathroom not only "highly incriminating" but "devastating" evidence of the petitioner's guilt.

Immediately following the interview, O'Mara wrote, reviewed, and signed a police report about the interview, relying in part on contemporaneous notes that he had taken at the time. Mucherino also reviewed and signed the report. The report does not state that the petitioner said either, "is that the bathroom there" or "[t]hat is the bathroom there," or otherwise indicate any familiarity with the victim's home. Nor does it state that the petitioner pointed at the photograph in the

direction of the bathroom. Instead, the original report reflects that the petitioner *asked* the officers if the victim was lying in a bathroom.

On September 10, 1986, Detective Andrew Ocif, who by then had replaced Mucherino as the Connecticut state police officer assigned to the investigation, arrested the petitioner on an unrelated larceny charge and transported him to state police barracks for processing. While at the barracks, Ocif spoke with Mucherino about his December 9, 1985 interview of the petitioner. At the petitioner's criminal trial, Ocif testified that, while speaking to Mucherino at the barracks, Mucherino informed Ocif that, during that December 9, 1985 interview, the petitioner had pointed to the crime scene photograph of the victim and said, "there was a bathroom there." After advising Mucherino that O'Mara's written report did not contain this information, Ocif requested that Mucherino ask O'Mara to file a new report that did include that statement by the petitioner. According to O'Mara, Ocif "badgered [him] for a better part of a year to get the [new] report in." On May 5, 1987, O'Mara finally provided the requested addendum to the original report.

In the fall of 1987, the petitioner was incarcerated at the John R. Manson Youth Institution (Manson Youth Institution) in the town of Cheshire. There, while working in the laundry room, he met an eighteen year old fellow inmate, Robert Perugini. On December 7, 1987, Ocif visited Perugini and informed him that he was investigating a murder that he knew the petitioner had committed. Perugini, who was then serving a seventeen year sentence for conspiracy to commit murder, kidnapping in the first degree and robbery in the first degree, agreed to provide incriminating information about the petitioner, but only if "there was something in it for [him] . . . ." Thereafter, the state entered into an agreement with Perugini pursuant to which it agreed to notify the Board of Pardons about Perugini's cooperation. Perugini then told Ocif that, in the summer of 1987, the petitioner had told him that he was worried that his release from the Manson Youth Institution would get "held up because of a murder investigation." According to Perugini, the petitioner also told him that he and Henning had killed an old man with a knife while robbing a house in New Milford.[9]

While incarcerated at the Manson Youth Institution, the petitioner also befriended fellow inmate Todd Cocchia. After their release from custody in 1988, the petitioner and Cocchia lived together in Danbury for approximately two months before moving together to Norfolk, Virginia. On June 22, 1988, Cocchia was arrested and subsequently detained in a Norfolk jail. On July 12, 1988, Ocif visited Cocchia in Virginia where Cocchia was being held, and Cocchia agreed to provide incriminating information about the petitioner. In

exchange, the state of Connecticut entered into an agreement with Cocchia pursuant to which it agreed, first, not to seek any prison time for Cocchia's probation violation and, second, to notify the Office of the State's Attorney for the judicial district of Danbury, where Cocchia had a pending criminal matter, of his cooperation in the petitioner's case. Additionally, because of his cooperation with Connecticut authorities, prosecutors in Virginia agreed that Cocchia would receive a sentence of time served on the charges that were pending against him there.

In 1989, the petitioner was arrested for the victim's murder, and a jury trial subsequently ensued. At that trial, Cocchia testified that the petitioner had told him while they were en route to Virginia that he needed to leave Connecticut because he had killed a man during a burglary.[10] On cross-examination, however, Cocchia acknowledged that, when he was first interviewed by Ocif, Cocchia answered incorrectly, or could not answer at all, as to whether the petitioner had committed the murder alone or with an accomplice, whether the crime occurred at night or in the daytime, and as to the name of the town where the crime was committed. In accordance with his agreement with the state, Perugini also testified that the petitioner had confessed to him.

Because there was no forensic evidence connecting the petitioner to the crime, the state's case against him was based almost entirely on Cocchia's and Perugini's testimony, the testimony of Kennel and Church, both of whom heard a noisy vehicle on the night of the murder, the fact that the petitioner was driving such a vehicle that evening, and Yablonski's testimony, which the state relied on to demonstrate consciousness of guilt predicated on the theory that the petitioner had lied to the police about the time he returned to New Milford in an effort to conceal his involvement in the murder.

The state also adduced testimony from Lee, then the director of the state forensic laboratory, to explain how it was possible that the petitioner and Henning could have stabbed the victim so many times without getting any blood on their clothing and without transferring any blood to the Buick. Lee explained that, although the victim fought with his assailants, all of the blood spatter in the hallway was uninterrupted, meaning that no individual or object was between the victim and the walls or floor to interrupt the blood spatter. According to Lee, this could explain why the assailants were not covered in the victim's blood.

During his testimony, Lee relied on certain photographs of the crime scene. One such photograph was of two towels hanging next to the sink in an upstairs bathroom. Although the towels had not been tested for the presence of blood—a fact that the state now concedes—Lee testified that they had, in fact, been so

tested, stating that a "[s]mear of blood was found on [one of] the towel[s]" and that this smear was "[a]nalyzed and shows" blood. When Lee stated that he could not "recall if it was human blood or animal [blood]," the petitioner's trial counsel, Alfred B. Mencuccini, objected to the admission of the photograph, arguing that the state had not established that the substance on the towel was, in fact, blood. In response, the prosecutor argued that "[Lee could] testify as to what he did with respect to that towel, what he observed, and what he had done." Thereafter, outside the presence of the jury, the following exchange occurred between the court and the prosecutor:

"The Court: There is no evidence of this towel before this time.

"[The Prosecutor]: Somebody has to find it. I mean, [Lee] is the person that noted it.

"The Court: Are you prepared to admit it?

"[The Prosecutor]: I am prepared to—I do not intend to use the towel, but just have [Lee] testify that he found the towel and what he observed on it and its location."

Following this exchange, the court overruled the objection of the petitioner's counsel. Thereafter, in reference to the same photograph, Lee reiterated that it "depicts the portion of the [upstairs] bathroom—bathroom, two towels. This towel had a reddish smear, very light smear. Subsequently, that smear was identified to be blood." At no time did the prosecutor correct Lee's testimony in this regard.

At the close of the state's case, the petitioner moved for a judgment of acquittal, which the trial court denied. The petitioner then presented the testimony of Smith, the victim's neighbor who, in contrast to Church and Kennel, saw the loud vehicle that he heard on the night of the murder. When Smith was shown a photograph of the rear taillights of the stolen Buick, he testified unequivocally that they were not the taillights he had observed on the night of the murder. Donna Dacey, a New Milford emergency services dispatcher who was on duty on December 2, 1985, also testified for the petitioner. Dacey explained that she had received a call at 4:49 or 4:50 a.m. from the victim's daughter, Columbo, who stated in a "[h]ighly excited" voice, "[o]h my God, he has a knife." Dacey testified that she had no idea who Columbo was referring to at the time of the call.

In his closing argument, the prosecutor, relying on Lee's reconstruction of the crime, stated that the evidence demonstrated that "there were two perpetrators, separate and distinct footwear, a struggle ensued, the struggle started in the [downstairs] bathroom area, progressed down the hall, [the victim's] head on at least three occasions was struck against the molding, the various doorjambs, blood was spilled, the man was stabbed." The prosecutor further asserted that the

bloody footwear impressions, blood stained bathroom towel, and blood in the victim's bedroom indicated that "the burglary continued after the bloodletting." He maintained, moreover, that there was no forensic evidence connecting the petitioner to the crime only because, as Lee had explained, all of the blood spatter was uninterrupted, indicating that the assailants would not have been covered in it. Another reason why there was no forensic evidence connecting the petitioner to the crime, he argued, was because the petitioner had cleaned up before leaving the scene. "There was testimony that there was blood by the bathroom sink upstairs. There was testimony that . . . the [petitioner] had access to clothing and footwear in that [dresser] drawer." The prosecutor further maintained that the petitioner and Henning, "one, weren't covered with blood and, two, had the opportunity between [12] and [2:30 a.m.] to change their clothes or dispose of their clothes."

Finally, the prosecutor reminded the jury about the petitioner's admissions to Cocchia and Perugini, his apparent familiarity with the interior of the victim's home, the loud vehicle that the victim's neighbors heard on the night of the murder, the fact that the petitioner and Henning were driving such a vehicle that evening, and Yablonski's testimony that the petitioner and Henning had lied to the police about what time they left Danbury that evening so as to place their arrival in New Milford sometime after the murder was committed. With respect to Smith, the neighbor who testified that the loud vehicle he saw was not the stolen Buick Regal, the prosecutor argued that the vehicle Smith saw could not have been the one that Kennel and Church heard because, whereas Kennel and Church described the vehicle as being extremely noisy, Smith described it as "not being particularly loud" and making a sound like "thump, thump, as opposed to the sound [a car makes] . . . with no muffler."

In his closing argument to the jury, the petitioner's trial counsel argued that the petitioner was the victim not only of shoddy police work but of police officers who had predetermined his guilt. Specifically, counsel asserted that, "once the police focused on [the petitioner], they developed [a] case of tunnel vision" so extreme that they failed to take the most obvious investigative steps and "ignored every piece of evidence that cast doubt [on the petitioner's guilt] . . . ." That evidence, counsel argued, included the information provided by Smith, the only neighbor who had actually seen the vehicle that the other neighbors had only heard. It also included the bizarre behavior of Columbo, the victim's daughter, who had told the dispatcher when she called to report her father's murder that there was a man in her home holding a knife. "That knife had to be held by the person who [murdered the victim]," the petitioner's counsel argued, "[b]ut the police did

nothing to clear up that question. Nothing at all."

The petitioner's counsel also maintained that, because there was no evidence linking the petitioner to the crime, and because the evidence that did exist pointed elsewhere, the police were compelled to create evidence. They did this, he argued, first, by having O'Mara amend the report of his December 9, 1985 interview with the petitioner to falsely reflect that the petitioner was familiar with the interior of the victim's home and, second, by offering leniency to two jailhouse informants wholly lacking in credibility. Counsel argued that O'Mara's explanation for why he had not included the petitioner's allegedly suspicious statement about the bathroom in the original report—namely, because he was "busy" and "had a number of distractions" on the day of the interview—was "completely unworthy of belief." Counsel maintained that, if the petitioner really had incriminated himself in the presence of two such experienced investigators, "you know darn well it would have been in that [original] report." Finally, counsel reminded the jury of the complete lack of forensic evidence connecting the petitioner to the crime, arguing that it was inconceivable that the petitioner and Henning could have committed such a crime without getting any blood on their clothing or transferring any trace evidence to the Buick.

The jury deliberated for three days before reaching a verdict. During those deliberations, the jury asked to have the testimony of several witnesses read back[11] and to be reinstructed on the meaning of reasonable doubt. The jury ultimately found the petitioner guilty of felony murder, and the trial court rendered judgment in accordance with the verdict, sentencing the petitioner to a term of imprisonment of fifty-five years. This court subsequently affirmed the petitioner's conviction on appeal in *State* v. *Birch*, supra, 219 Conn. 751.

In 1997, the petitioner filed an amended petition for a writ of habeas corpus, alleging that his trial counsel had rendered ineffective assistance in numerous respects. The habeas court rejected the petitioner's claims, and he appealed to the Appellate Court, which affirmed the habeas court's judgment. *Birch* v. *Commissioner of Correction*, 57 Conn. App. 383, 385, 749 A.2d 648, cert. denied, 253 Conn. 920, 755 A.2d 213 (2000).

In 2000 and 2001, respectively, the petitioner filed two additional habeas petitions in which he alleged that his first habeas counsel, Avery Chapman, had rendered ineffective assistance by failing to adequately investigate and present his claims against his trial counsel, including his claim that trial counsel had rendered ineffective assistance by failing (1) to consult and present the testimony of a forensic footwear impression expert, (2) to consult and present the testimony of a crime scene reconstructionist, (3) to consult and present the

testimony of a forensic pathologist, (4) to investigate and present a third-party culpability defense against Columbo,[12] and (5) to investigate, cross-examine, impeach or otherwise challenge the testimony of Cocchia, Perugini, and Ocif. As we observed in the companion case of *Henning* v. *Commissioner of Correction*, supra, 334 Conn. 1, "[t]he petitioner also claimed actual innocence on the basis of, among other things, numerous DNA tests conducted over the last decade by the Connecticut Forensic Science Laboratory, which had excluded the petitioner, [Henning], and Yablonski as the source of DNA recovered from the crime scene, and had revealed the DNA of an unknown female on four key pieces of evidence with which the assailants were known or thought to have come in contact.[13] Finally, the petitioner alleged that the state had violated his right to a fair trial by adducing Lee's false testimony that there was blood on the bathroom towel, testimony that had permitted the prosecutor to argue that the reason investigators failed to find forensic evidence on the petitioner's clothing or in the Buick was because the petitioner had cleaned himself up before leaving the victim's home.

"A consolidated trial on the petitioner's . . . habeas petition[s], his petition for a new trial, and the closely related habeas and new trial petitions of [Henning]; see footnote [5] of this opinion; was conducted over a period of several weeks in November and December, 2015, during which the petitioner and [Henning] called a number of expert and lay witnesses whose testimony cast serious doubt on the state's theory of the case.[14] In support of the petitioner's claim that the prosecutor's failure to correct Lee's incorrect testimony entitled the petitioner to a new trial, he argued that, under a line of cases following the United States Supreme Court's seminal opinion in *Brady* v. *Maryland*, supra, 373 U.S. 83, including *United States* v. *Bagley*, 473 U.S. 667, 679 and n.9, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) (opinion announcing judgment) (conviction obtained with state's knowing use of perjured testimony must be set aside unless state can establish testimony was harmless beyond reasonable doubt), *State* v. *Ouellette*, 295 Conn. 173, 186, 989 A.2d 1048 (2010) (prosecutor who knows that testimony of witness is false or substantially misleading must correct that testimony regardless of lack of intent to lie on part of witness), and *State* v. *Cohane*, 193 Conn. 474, 498, 479 A.2d 763 (prosecutor has responsibility to correct false testimony when prosecutor knew or should have known that testimony was false), cert. denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984), the respondent, the Commissioner of Correction, was required to establish that Lee's concededly incorrect testimony was immaterial beyond a reasonable doubt, a standard that, the petitioner further claimed, the respondent could not meet.

"Following the trial, the habeas court issued a memo-

randum of decision in which it denied or dismissed all of the petitioner's claims. With respect to the petitioner's claim that the state had deprived him of a fair trial by failing to correct Lee's concededly incorrect testimony,[15] the court concluded, contrary to the contention of the petitioner, that the respondent was not required to demonstrate the immateriality, that is, the harmlessness, of that testimony beyond a reasonable doubt. The habeas court concluded, rather, that that heavy burden applies only when the state fails to correct *perjured* testimony, and it appeared clear to the habeas court that, in the absence of any contrary evidence, 'Lee mistakenly, but honestly, believed he tested [the bathroom towel] rather than contrived a false story about having done so.' In other words, as the habeas court explained, although Lee had testified incorrectly, he was 'not lying under oath.' The habeas court then concluded that the applicable standard was 'the classic test' for determining whether the petitioner was entitled to a new trial as a consequence of the state's *Brady* violation, a standard that, as the habeas court further explained, is satisfied 'only if [the petitioner can demonstrate that] there would be a reasonable probability of a different result if the [correct] evidence had been disclosed. . . . A reasonable probability . . . is one [that] undermines confidence in the outcome of the trial . . . .' " (Footnote added; footnotes in original; footnote omitted.) *Henning* v. *Commissioner of Correction*, supra, 334 Conn. 18–22.

"Applying this standard, which is considerably less favorable to the petitioner than the standard that the petitioner himself had advanced, the habeas court concluded that Lee's incorrect testimony was immaterial because the state's case against the petitioner did not in any way rely on forensic evidence. Specifically, the court explained: 'Because no forensic nexus was produced, the state's case against [the petitioner] hinged on the credibility of . . . [numerous] lay witnesses rather than on . . . Lee's [testimony]. The impact of the victim's neighbors' testimony about being disturbed by a very loud vehicle and the false time line fabricated by [the petitioner] and [Henning] was far more incriminating and [was] in no way diminished by . . . Lee's error as to whether a reddish smear on a towel . . . was or was not tested for blood.' The court further reasoned that Lee's incorrect testimony also was immaterial because the prosecutor could have explained the absence of any forensic evidence simply by arguing that the petitioner and [Henning] had disposed of their bloody clothing and shoes sometime after leaving the victim's home and prior to their arrest.

"On appeal, the petitioner claims that the legal standard for materiality that the habeas court applied, that is, that the petitioner was required to demonstrate that the false testimony at issue undermines confidence in the verdict, was incorrect, and that the proper standard

required the respondent to establish beyond a reasonable doubt that the testimony was immaterial. The petitioner further contends that, upon application of the proper standard, it is apparent that Lee's incorrect testimony was material and, therefore, that the prosecutor's failure to correct that testimony dictated that the petitioner be awarded a new trial because the state's case was weak and Lee's testimony offered jurors an explanation as to why no incriminating blood evidence was found despite the victim's massive blood loss and the fact that the victim was killed at such close range. The respondent, for his part, maintains that (1) the habeas court properly applied the less stringent materiality standard of *Brady*, (2) Lee's incorrect testimony was not adduced for the purpose of providing an explanation for why no blood evidence was found linking the petitioner to the victim's murder, and the prosecutor did not rely on that testimony to that end, (3) the state's case was so strong that there is no reasonable probability that the jury verdict would have been any different without it, and (4) even if we were to apply the demanding materiality standard pursuant to which the respondent must establish beyond a reasonable doubt that Lee's incorrect testimony had no bearing on the verdict, the state's evidence was so strong that that more exacting standard has been met." Id., 22–23.

In *Henning*, we rejected the respondent's contention that the habeas court properly applied *Brady*'s less stringent materiality standard in determining whether Henning was prejudiced by the state's failure to correct Lee's testimony. See id., 23. Our analysis in *Henning* is fully applicable to the present case: "When . . . a prosecutor obtains a conviction with evidence that he or she knows or should know to be false, the materiality standard is significantly more favorable to the defendant. [A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair . . . and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *United States* v. *Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976) . . . . This standard . . . applies whether the state solicited the false testimony or allowed it to go uncorrected . . . and is not substantively different from the test that permits the state to avoid having a conviction set aside, notwithstanding a violation of constitutional magnitude, upon a showing that the violation was harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *Henning* v. *Commissioner of Correction*, supra, 334 Conn. 24–25.

Accordingly, "it is readily apparent that the habeas court incorrectly concluded that the respondent was not required to establish beyond a reasonable doubt that the prosecutor's failure to correct Lee's incorrect testimony was immaterial. Contrary to the respondent's assertion, controlling case law makes it abundantly

clear that that strict materiality standard applies whenever the state fails to correct testimony that it knew or, as in the present case, should have known to be false. As we explained in *State* v. *Cohane*, supra, 193 Conn. 474, a case directly on point, [t]he references in *Agurs* to perjured testimony must be taken to include testimony [that the prosecutor knew or should have known] to be false or misleading *even if the witness may not have such an awareness. . . .* [T]he [prosecutor's] actions in failing to disclose [false or misleading testimony] corrupt[s] the trial process and denie[s] the defendant his constitutional right to a fair trial just as surely as if the state's case included perjured testimony.''[16] (Emphasis in original; internal quotation marks omitted.) *Henning* v. *Commissioner of Correction*, supra, 334 Conn. 26–27; see also *Mesarosh* v. *United States*, 352 U.S. 1, 9, 77 S. Ct. 1, 1 L. Ed. 2d 1 (1956) (''The question of whether [the witness'] untruthfulness . . . constituted perjury or was caused by a psychiatric condition can make no material difference . . . . Whichever explanation might be found to be correct in this regard, [the witness'] credibility has been wholly discredited . . . . The dignity of the . . . [g]overnment will not permit the conviction of any person on tainted testimony.'').

''Furthermore, it is inarguable that Lee, as the representative of the state police forensic laboratory, should have known that the bathroom towel had not been tested for blood. He, like any such witness, had an affirmative obligation to review any relevant test reports before testifying so as to reasonably ensure that his testimony would accurately reflect the findings of those tests. To conclude otherwise would permit the state to gain a conviction on the basis of false or misleading testimony even though the error readily could have been avoided if the witness merely had exercised due diligence; such a result is clearly incompatible with the principles enunciated in *Brady* and its progeny. Lee's incorrect testimony also must be imputed to the prosecutor who, irrespective of whether he elicited that testimony in good faith, is deemed to be aware of any and all material evidence in the possession of any investigating agency, including, of course, the state police forensic laboratory. See, e.g., *Kyles* v. *Whitley*, [514 U.S. 419, 437–38, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)] ([T]he . . . prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation [whether, that is, a failure to disclose is in good faith or bad faith] . . . the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable. . . .). Notably, the respondent does not claim otherwise. Thus, the only question remaining is whether the respondent has met his burden of establish-

ing that the prosecutor's failure to correct Lee's testimony concerning the bathroom towel was harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *Henning* v. *Commissioner of Correction*, supra, 334 Conn. 27–28.

As we previously indicated, the respondent argues that the state's failure to correct Lee's incorrect testimony was immaterial, or harmless, because the prosecutor did not offer that testimony to persuade the jury "that the towel was bloodied by the petitioner's efforts to wash off his crime," only "to establish the duration of the predicate burglary and the fact that it continued after the bloodletting." (Internal quotation marks omitted.) We disagree that Lee's testimony about the towel was offered solely for the purpose of establishing the existence and timeline of the burglary. In closing argument, the prosecutor expressly stated, "I suspect . . . that the [petitioner] will argue that there [are] no forensics putting [the petitioner] in the [victim's] house." To rebut this anticipated argument by the defense, the prosecutor reminded the jury of Lee's testimony that "the spatter patterns were uninterrupted" and "*that there was blood by the bathroom sink upstairs.*" (Emphasis added.) He also argued that "[t]here was testimony that . . . the [petitioner] had access to clothing and footwear in [the victim's dresser] drawer." Contrary to the respondent's assertions, the only possible inference that the prosecutor could have intended the jury to draw by virtue of his reference to the "blood by the bathroom sink upstairs" was that the petitioner used the second floor bathroom to clean up before leaving the victim's home. As we previously indicated, Lee testified that he had found blood on a towel hanging beside the second floor bathroom sink. Because that blood was the only blood Lee claimed to have found in the second floor bathroom, the prosecutor's reference to "blood by the bathroom sink upstairs"—a reference made by the prosecutor in the context of explaining the absence of forensic evidence "putting [the petitioner] in the [victim's] house"—was quite clearly a reference to Lee's testimony about the blood on the towel. There simply is no other evidentiary basis for this portion of the prosecutor's argument to the jury.

Nor are we persuaded by the respondent's contention that the state's case against the petitioner was sufficiently powerful as to take this case out of the purview of cases in which, in light of the state's use of testimony that it knew or should have known was false, reversal is "virtually automatic . . . ." *Adams* v. *Commissioner of Correction*, supra, 309 Conn. 359, 372, 71 A.3d 512 (2013). In *Henning*, we concluded that, although the evidence was sufficient to sustain a conviction, it was far from strong. See *Henning* v. *Commissioner of Correction*, supra, 334 Conn. 29. In many ways, the state's case against the petitioner was weaker than it was in *Henning*, largely because the state's case against the

petitioner turned primarily on the credibility of two jailhouse informants, both of whom were awarded valuable consideration in exchange for their testimony. Not surprisingly, the dubious trustworthiness of such jailhouse informant testimony has widely been acknowledged. See, e.g., *Kansas* v. *Ventris*, 556 U.S. 586, 597 n.2, 129 S. Ct. 1841, 173 L. Ed. 2d 801 (2009) ("[t]he likelihood that evidence gathered by self-interested jailhouse informants may be false cannot be ignored"); *State* v. *Arroyo*, 292 Conn. 558, 567, 973 A.2d 1254 (2009) ("[i]n recent years, there have been a number of high profile cases involving wrongful convictions based on the false testimony of jailhouse informants"), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010); see also *State* v. *Patterson*, 276 Conn. 452, 469, 886 A.2d 777 (2005) ("an informant who has been promised a benefit by the state in return for his or her testimony has a powerful incentive, fueled by self-interest, to implicate falsely the accused").

Indeed, this court previously has recognized that, for purposes of applying *Brady*'s materiality prong, a murder case predicated on a defendant's alleged or actual admissions, in which there are no eyewitnesses and no forensic or other physical evidence connecting the defendant to the crime, is not a particularly strong one, even when the admissions were made to persons whose credibility is not so inherently suspect as that of a jailhouse informant. See *Skakel* v. *Commissioner of Correction*, 329 Conn. 1, 85–86, 188 A.3d 1 (2018), cert. denied,      U.S.     , 139 S. Ct. 788, 202 L. Ed. 2d 569 (2019); *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 323–25, 112 A.3d 1 (2015). It is precisely because of the intrinsic unreliability of jailhouse informant testimony that we have required our trial courts "[to] give a special credibility instruction to the jury whenever such testimony is given, regardless of whether the informant has received an express promise of a benefit. As we indicated in [*State* v.] *Patterson*, [supra, 276 Conn. 465, 470], the trial court should instruct the jury that the informant's must be reviewed with particular scrutiny and weighed . . . with greater care than the testimony of an ordinary witness." (Internal quotation marks omitted.) *State* v. *Arroyo*, supra, 292 Conn. 569–70.

Apart from the petitioner's alleged admissions to Cocchia and Perugini, the only other evidence connecting him to the victim's murder was the testimony of O'Mara and Mucherino that the petitioner, when shown a crime scene photograph of the victim's body, pointed in the direction of the bathroom and said either, "is that the bathroom there" or "[t]hat is the bathroom there," even though no bathroom was visible in the photograph. The state also relied on the testimony of Church and Kennel regarding the noisy vehicle that they heard on the night of the murder and Yablonski's testimony that the petitioner and Henning had lied about what time they

returned to New Milford that evening. As we indicated, however, the state's theory regarding the noisy vehicle was substantially undercut by the testimony of Smith, who stated unequivocally that the noisy vehicle he saw on the night of the murder was not the stolen Buick. As for O'Mara's and Mucherino's testimony, even if the jury were inclined to believe their testimony, it was not particularly incriminating as to the petitioner. The fact is, however, that the jury had good reason to question the reliability of their testimony because it strains credulity to think that two highly experienced detectives, when memorializing an interview they had just conducted with the prime suspect in a murder investigation, would fail to include in that report that the suspect had disclosed what one of the detectives considered to be ''devastating'' evidence of his involvement in the murder.

The respondent next argues that the prosecutor's failure to correct Lee's incorrect testimony was harmless beyond a reasonable doubt because there is little or no chance that the jury credited the state's theory that the assailants used the bathroom to wash up before leaving. Specifically, the respondent argues that, "[i]f the jury [had been] in search of an explanation as to how such a bloody crime scene could have been wiped clean from the men and their belongings before they could transfer any of it to the Buick, it is difficult to imagine that the jury would have been satisfied by the suggestion that the bloody scene distilled to a single towel smear . . . . The more obvious conclusion is that the jury found . . . that the perpetrators *were not* doused in blood because, as . . . Lee testified, the blood spatter patterns were not interrupted, and, therefore, [the blood] did not spatter . . . on those standing nearby . . . ." (Emphasis in original.) As we stated in *Henning* v. *Commissioner of Correction*, supra, 334 Conn. 1, in rejecting this very argument, "[t]hat conclusion is far from obvious and by no means compelled from the facts. Indeed, we cannot say with any confidence that the jury found either theory more plausible than the other as a basis for explaining the total absence of forensic evidence. The more probable scenario, rather, is that the jury, like the state, relied on *both* theories. That is, the jury very reasonably could have found, on the basis of the blood spatter testimony, that the killers may have had less blood on them than the evidence otherwise would seem to indicate, and, on the basis of the towel testimony, whatever blood they did have on them, they simply washed off." (Emphasis in original.) Id., 31.

"Finally, because Lee's testimony provided the sole evidentiary basis for both of the state's theories regarding the dearth of forensic evidence, the prosecutor's failure to correct Lee's testimony about the bathroom towel was material for the additional reason that it deprived the petitioner of the opportunity to impeach

Lee's blood spatter testimony. See, e.g., *Merrill* v. *Warden*, 177 Conn. 427, 431, 418 A.2d 74 (1979) (The fact that [the witness] was a key witness made his credibility crucial to the state's case. In assessing his credibility the jury [was] entitled to know that he was testifying under false colors. Such knowledge could have affected the result.); *State* v. *Grasso*, 172 Conn. 298, 302, 374 A.2d 239 (1977) ([w]hen a conviction depends entirely [on] the testimony of certain witnesses . . . information affecting their credibility is material in the constitutional sense since if they are not believed a reasonable doubt of guilt would be created). To be sure, the prosecutor's greatest challenge at trial was to explain how it was possible for two teenagers to have stabbed the victim twenty-seven times in the confines of a narrow hallway, severed his jugular vein, struck him over the head several times, tracked blood all over the house, and yet somehow managed not to leave any trace evidence in their getaway vehicle—which, as we previously discussed, did not show any signs of having been cleaned when the police recovered it a few days later—or elsewhere. To answer this question, the state proffered two theories, one of which the respondent now concedes was predicated on Lee's incorrect testimony. If the jury had known that Lee's testimony about finding blood on the bathroom towel was incorrect, that knowledge might well have caused it to question the reliability of his other testimony. If that had occurred, the state's entire case against the petitioner could very well have collapsed." (Internal quotation marks omitted.) *Henning* v. *Commissioner of Correction*, supra, 334 Conn. 32.

In light of the foregoing, we conclude that the state's failure to correct Lee's testimony that there was blood on the bathroom towel deprived the petitioner of a fair trial. Because the habeas court incorrectly reached a contrary conclusion, that court's judgment must be reversed, and the petitioner must be afforded a new trial.

The judgment is reversed and the case is remanded with direction to render judgment granting the habeas petition and ordering a new trial.

In this opinion the other justices concurred.

* June 14, 2019, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Henning was tried separately and convicted of felony murder, as well. This court also rejected Henning's appeal. See *State* v. *Henning*, 220 Conn. 417, 431, 599 A.2d 1065 (1991).

[2] Unless otherwise noted, all references hereinafter to the habeas court are to *Sferrazza, J.*, and all references to the habeas petition are to the petition in the present case.

[3] As we explain hereinafter in greater detail, Henning also sought posttrial relief that, in many respects, mirrors the relief that the petitioner sought.

[4] As we discuss more fully hereinafter, the respondent, the Commissioner of Correction, concedes that the testimony of Lee at issue in this case was false or misleading—terms commonly used in cases, like the present one, that involve due process claims predicated on the state's improper use of testimony in a criminal trial—in the sense that it was factually wrong or

incorrect. In its memorandum of decision, however, the habeas court found that Lee's testimony was mistaken and not intentionally false—a conclusion that the petitioner has not challenged—and we have no reason to second-guess that determination. Nevertheless, for the reasons set forth hereinafter, we conclude that, in the circumstances presented, the petitioner is entitled to a new trial because, under *Brady* and its progeny, it makes no difference whether Lee's testimony was intentionally false or merely mistaken. In either case, if, as we conclude, the state knew or should have known that Lee's testimony was incorrect, the petitioner is entitled to a new trial unless the respondent can demonstrate that the incorrect testimony was harmless beyond a reasonable doubt, a burden that the respondent cannot meet. Finally, although Lee's testimony was false or misleading insofar as it was contrary to the facts, we characterize it as incorrect rather than false or misleading because the latter terms might be understood as connoting a dishonest or untruthful intent, an implication that would be incompatible with the habeas court's determination.

[5] The petitioner also filed a petition for a new trial pursuant to General Statutes § 52-270 (a) on the basis of newly discovered evidence. Prior to trial, the habeas court consolidated that petition with the present habeas petition and with the closely related habeas and new trial petitions of Henning. The habeas court rejected all of the claims in the four petitions, and the petitioner and Henning separately appealed to the Appellate Court from the judgments denying their habeas and new trial petitions. We thereafter transferred all four appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2. In a separate opinion also issued today, we have dismissed as moot the petitioner's appeal from the habeas court's denial of his petition for a new trial in view of our determination that the petitioner must be afforded a new trial on the basis of the state's failure to correct Lee's incorrect testimony. See *Birch* v. *State*, 334 Conn. 69, 72, A.3d (2019). We also have reversed the judgment of the habeas court in Henning's habeas case, as well; see *Henning* v. *Commissioner of Correction*, 334 Conn. 1, 33, A.3d (2019); see also *Henning* v. *State*, 334 Conn. 33, 36, A.3d (2019) (dismissing as moot Henning's appeal from denial of petition for new trial), a decision that, like our decision in the present case, is predicated on the state's use of Lee's incorrect testimony.

We note, moreover, that, at various points throughout this opinion, we briefly discuss a number of the other claims raised by the petitioner in his habeas petition and in his petition for a new trial. We do not decide the merits of any of those claims, however, because of our conclusion that the petitioner is entitled to a new trial due to Lee's incorrect testimony. Insofar as we do discuss them, we do so only to place the present claim in the broader context of the several significant issues that the petitioner also raises as a basis for his entitlement to a new trial. Finally, many of the facts and much of the substantive analysis in this case is taken directly from our decision in *Henning* v. *Commissioner of Correction*, supra, 334 Conn. 1, because that opinion addresses the identical claim concerning the state's failure to correct Lee's incorrect testimony. To the extent that the evidence adduced at the petitioner's underlying criminal trial or in connection with the present habeas case differs in any relevant respect from that presented at Henning's criminal or habeas trial, all such differences are duly noted.

[6] "A 'fence' is a person who receives and sells stolen goods." *Henning* v. *Commissioner of Correction*, supra, 334 Conn. 5 n.5.

[7] We note that, at Henning's criminal trial, Yablonski testified that she, Henning and the petitioner agreed to tell the police that they had left Danbury at 12:30 or 1 a.m., not at 2 a.m., as she testified at the petitioner's trial. *Henning* v. *Commissioner of Correction*, supra, 334 Conn. 8.

[8] O'Mara and Mucherino provided somewhat conflicting testimony about what the petitioner said when he was shown the crime scene photograph of the victim's body. O'Mara testified that, pointing in the direction of where the bathroom would be, the petitioner asked, "is that the bathroom there?" Mucherino testified that the petitioner stated, "[t]hat is the bathroom there."

[9] We note that, in his habeas petition, the petitioner alleged that trial counsel in his criminal case, Alfred B. Mencuccini, had rendered ineffective assistance by failing to adequately impeach Perugini at trial. In support of this contention, the petitioner claimed that competent counsel would have interviewed Perugini's known associates, including Stephen Alan McDonald and Daniel Edwards, and learned that Perugini had provided false testimony against the petitioner in exchange for the state's promise that he not be transferred to a prison for adult offenders. In support of this contention, McDonald testified at the petitioner's habeas trial that, when he was incarcer-

ated with Perugini at the Manson Youth Institution, he asked Perugini why he had lied to the police about the petitioner's having confessed to him. Perugini, who was about to be transferred from that institution because he was turning nineteen, responded, "he did what he had to do because he didn't want to go to [the] Somers [prison]." Similarly, Edwards, who was Perugini's best friend at the time, testified that, in early 1989, he received a letter from Perugini in which Perugini stated that he had arranged a deal with the state whereby he would testify against the petitioner, albeit falsely, in exchange for a reduced sentence. According to Edwards, Perugini "feared Somers" because of its reputation for sexual violence against inmates.

[10] Cocchia recanted his testimony at the petitioner's habeas trial, stating that, in fact, the petitioner had never told him that he was in any way involved in the victim's murder. Cocchia further testified that, when Ocif came to visit him in Virginia in 1988, he left "the [police] file right there in front [of him], opened," and that everything he subsequently told the police about the murder he learned from "[r]eading [the open police file] . . . [and] listening to what they [the police] were saying [about it]."

[11] The jury asked to have the testimony of O'Mara, Mucherino, Yablonski, Cocchia and Perugini read back.

[12] As we explained in *Henning* v. *Commissioner of Correction*, supra, 334 Conn. 1, in which we have addressed an identical claim involving the same relevant facts, "at the habeas trial, the petitioner sought to demonstrate that the crime scene had been staged to resemble a burglary and that his trial counsel had rendered ineffective assistance in failing to raise a third-party culpability defense against Columbo and Richard Burkhart, Columbo's lover and employer at the time of the murder, and for whom the victim also had worked and who allegedly owed the victim money. In support of this contention, the petitioner adduced evidence that, when Columbo was initially interviewed by the police on the night of the murder, she claimed to have been home all evening and to have heard the victim coughing, although she did not check on him. She then told the police that she actually had gone out that evening and returned home between 2:30 and 3 a.m. Later, she told the police that she had lied in her earlier statements to prevent Burkhart from finding out that she had been with another man that evening. Columbo also told the police that she had left the house at around 9:30 p.m. and returned sometime between 4 and 4:30 a.m. Police records indicate, however, that Columbo did not call for help until 4:50 a.m. and that, when she did, according to the emergency dispatcher, she screamed, '[o]h God, he's got a knife in his hand.' There was also evidence that Columbo exhibited highly unusual behavior immediately after the murder. For example, one of the first responders, Anita Bagot, testified that Columbo barricaded herself in the dining room shortly after the police arrived and, later, asked Bagot, '[w]hy would he do it . . . [w]hy would he do it,' clearly suggesting that she knew the identity of the assailant. The petitioner also presented evidence at the habeas trial that there was animus between Burkhart and the victim, despite Burkhart's statement to the police that he and the victim 'had an excellent relationship' and that he 'loved' the victim. One witness who had worked for Burkhart, Cynthia M. Russo-Donaghy, testified that Burkhart had a scratch on his face on the morning after the murder and that the victim had told her that Burkhart was a 'son of a bitch' and that he 'hate[d]' him. The petitioner also established that the state police received an anonymous call on May 22, 1986, from an unknown male who said that Burkhart had murdered the victim.

"We note, finally, that the petitioner, in support of his petition for a new trial, presented the deposition testimony of John Andrews, who stated that, after the murder, he and Columbo became romantically involved and, for a time, lived together. Andrews stated that, during an argument one night, Columbo charged at him with a knife and told him that 'she would kill [him] like she killed her father.' According to Andrews, late at night sometime thereafter, while he was in the kitchen and Columbo was upstairs, he was attacked and severely injured by an unknown assailant who beat him over the head and repeatedly stabbed him. Andrews further explained that, during the assault, he heard a male voice telling him to 'leave and don't come back.' Following this incident, Andrews decided to move out and, while packing his belongings, found a six to seven inch knife blade without a handle protruding from a basement wall. Andrews never told anyone about Columbo's threat or his discovery of the knife blade until years later, when he was contacted by the Connecticut Innocence Project. In its memorandum of decision, the habeas court observed that 'Andrews [had] no obvious reason to fabricate [his] recollections.' " Id., 16–17 n.11.

[13] "In this regard, Christine Mary Roy, a forensic science examiner with the state's Division of Scientific Services, testified at the petitioner's habeas trial that, in addition to the victim's DNA, the DNA profile of an unknown female was found on the bloody cigar box, the inside of the front waistband of the victim's underwear, the metal ring that was found under the victim that was thought to be part of the murder weapon, and a floor board that the police had removed, which contained two sets of bloody footprints. Lucinda Lopes-Phelan, another forensic science examiner with the Division of Scientific Services, testified that she had tested the victim's underwear on the theory that one of the assailants may have grabbed him there during the struggle that led to the victim's murder." *Henning* v. *Commissioner of Correction*, supra, 334 Conn. 18 n.13.

[14] "For example, in support of his claim that trial counsel was ineffective insofar as counsel failed to consult a forensic footwear impression expert, the petitioner presented the testimony of William Bodziak, a former agent with the Federal Bureau of Investigation (FBI) and a prominent footwear impression expert. Bodziak testified that, using techniques available at the time of the petitioner's criminal trial, he was able to determine that one of the two sets of bloody footprints from the crime scene could not possibly have been left by either the petitioner or [Henning] because it was made by a size 9 or smaller shoe, perhaps even as small as a size 7 and 1/2, and the petitioner and [Henning] wore shoes sized . . . 10 and 1/2 to 11 [and 11 and 1/2], respectively. According to Bodziak, the size difference between the bloody footprints and the petitioner's and [Henning's] shoes at the time of the murder was 'enormous . . . .' With respect to Bodziak's expertise, the habeas court made the following findings: 'Obviously, expert footwear analysts were available at the time of the petitioner's [criminal] trial in 1989. From 1973 to 1997 . . . Bodziak was a special agent for the FBI who specialized [in], among other [things] . . . footwear imprint analysis. He testified at the [petitioner's] habeas trial, and he is a well trained, extensively experienced, and highly qualified expert in this field of criminology. He has testified in nearly every state and federal trial court in the United States, including at the trials of [Orenthal James] Simpson and [Timothy McVeigh] the Oklahoma City bomber.' " *Henning* v. *Commissioner of Correction*, supra, 334 Conn. 19 n.14.

We note that, despite Bodziak's highly exculpatory testimony that neither the petitioner nor Henning was the source of one of the two footwear impressions that the state argued was left by one of the assailants, the habeas court rejected the petitioner's claim that his trial counsel was constitutionally ineffective for failing to consult a footwear expert. In doing so, the habeas court credited the state's contention that the petitioner's trial counsel reasonably "feared that, if he hired [a footwear impression expert], he had little to gain and everything to lose if that independent examination revealed that the bloody imprints came from a boot [that] fell within the size range that encompassed the petitioner's size" because, the habeas court explained, the relevant rule of practice at that time, Practice Book (1978–97) § 769 (2), "allowed the prosecutor to require a criminal defendant to disclose the existence of and permit inspection of any document within the control of the defense [that] is a report or statement as to a physical . . . [examination] or scientific test or experiment made in connection with the particular case prepared by, and relating to the anticipated testimony of, a person whom the defendant intends to call as a witness." (Internal quotation marks omitted.) Clearly, however, any concern that the petitioner's trial counsel might have had about consulting an expert was unfounded because § 769 (2), by its plain and unambiguous terms, required a defendant to turn over any such report or statement *only if that defendant intended to call the expert as a witness*. Thus, if counsel had retained an expert whose opinion would not have been helpful to the petitioner, counsel would have had no reason to call that expert as a witness or even to have had the expert produce a statement or report documenting his or her opinion. The habeas court was incorrect, therefore, in concluding that the petitioner's trial counsel reasonably decided not to consult a footwear impression expert because of the then applicable reciprocal discovery provisions of the rules of practice.

[15] "In regard to that testimony, the habeas court found in relevant part: 'As to . . . Lee's testimony, he erroneously testified that he tested a reddish substance on a towel seized from an upstairs bathroom, which test indicated a positive result for blood. That stain was never tested by . . . Lee or anyone at the crime laboratory before the petitioner's criminal trial. In conjunction with the present habeas action, the towel was tested, and the reddish smear proved negative for blood.' The respondent, the Commissioner

of Correction, has never contested the results of that test." *Henning* v. *Commissioner of Correction*, supra, 334 Conn. 21 n.16.

[16] "For reasons unknown to us, the respondent, in his brief, does not even cite to *Cohane*, let alone seek to distinguish that case or to have this court overrule it. The habeas court similarly failed to cite to *Cohane*." *Henning* v. *Commissioner of Correction*, supra, 334 Conn. 27 n.17.